1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11   JOSE SANTANA,                          Case No.:  3:16-cv-00105-GPC-JMA
     CDCR #AH-0190,
12                                          **ORDER:**
                                Plaintiff,
13                                          **1)  GRANTING DEFENDANT**
                     vs.                    **BUTERA'S AND HOOD'S MOTIONS**
14                                          **TO DISMISS PURSUANT TO**
     R. ZHANG, et al.,                      **Fed. R. Civ. P. 12(b)(6)**
15                                          **[ECF Nos. 8, 10]**
                                Defendants.
16                                          **AND**
17
18                                          **2)  SUA SPONTE DISMISSING**
19                                          **PLAINTIFF'S EIGHTH**
                                            **AMENDMENT CLAIMS AS TO ALL**
20                                          **REMAINING DEFENDANTS**
                                            **PURSUANT TO**
21                                          **28 U.S.C. § 1915(e)(2)(b)(ii)**
22
23

24                              **Introduction**

25        Jose Santana ("Plaintiff"), a prisoner at Richard J. Donovan Correctional Facility

26   ("RJD") in San Diego, California, proceeding pro se and in forma pauperis ("IFP"), has

27   filed a complaint pursuant to the Civil Rights Act, 42 U.S.C. § 1983 (ECF No. 1).

28   ///

                                          1

Plaintiff claims Defendants, all medical and medical appeals officials at RJD and Alvarado Medical Center ("AMC") in San Diego, acted with deliberate indifference to his serious medical needs, specifically, a methicillin resistant staphylococcus aureas ("MRSA") infection, which developed and recurred over the course of two years in violation of the Eighth Amendment. (ECF No. 1 at 21-37.) Plaintiff also alleges pendent state law claims of medical negligence and malpractice in violation of Cal. Govt. Code §§ 845.6 and 815.2, and the California Constitution, Art I, §§ 15, 17. (*Id.* at 37-48, 50-51.) He seeks declaratory and injunctive relief, as well as nominal, presumed, and punitive damages. (*Id.* at 52-53.)

Defendants Butera and Hood, both doctors employed by AMC, where Plaintiff was referred and admitted twice for emergency care, have filed Motions to Dismiss his first and third causes of action, as well as his request for punitive damages pursuant to FED. R. CIV. P. 12(b)(6). *See* Def. Hood's Mot. to Dismiss (ECF No. 8); Def. Butera's Mot. to Dismiss (ECF No. 10).[1] On June 16, 2016, the Court issued briefing schedules as to both Motions, determined that no proposed findings and recommendations by the magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and S.D. CAL. CIVLR 72.3(a) would be necessary, and permitted Plaintiff to file and serve his Opposition to both Motions no later than July 15, 2016. (*See* ECF Nos. 9, 11.) No opposition has been filed.[2]

---

[1]   No other Defendants have yet to be served, although the U.S. Marshal has returned summonses as unexecuted as to Defendants Benitez, Steward, and Robinson (ECF Nos. 12-14).

[2]   While S.D. CAL. CIVLR 7.1(f)(3)(a) requires the non-moving party to file a written opposition, or statement of non-opposition, and S.D. CAL. CIVLR 7.1(f)(3)(c) further provides that the failure to file an opposition "may constitute a consent to the granting of [the] motion," the Court declines to simply grant Defendants' Motions because they are unopposed. *See Ghazali v. Moran*, 46 F.3d 52, 53 (9th Cir. 1995) (per curiam) (noting that while that a district court may properly grant a motion to dismiss as unopposed pursuant to a local rule, enforcement of the local rule is within the district court's discretion); *see also Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010) ("'District courts have

Having considered both Motions on the papers submitted, the Court finds that Plaintiff has failed to state a plausible claim upon which relief may be granted as to both Defendants Butera and Hood, and therefore GRANTS their Motions to Dismiss pursuant to FED. R. CIV. P. 12(b)(6). The Court further finds that Plaintiff has failed to state a plausible Eighth Amendment claim for relief as to any other named Defendant, and therefore DISMISSES the remainder of his Complaint sua sponte pursuant to 28 U.S.C. § 1915(e)(2)(b)(ii).

## **Plaintiff's Complaint**

## I.   **Factual Allegations**

### A.   **Left Leg Abscess – December 2013 to February 2014**

From October 2013 through January 2014, Plaintiff claims Defendants Robinson, Silva, and Cook, his primary care providers at RJD, "had actual knowledge of" and failed to adequately treat a "staph/MRSA" infection in his left leg. (ECF No. 1 at 24, 37-39.)

Specifically, Plaintiff contends Robinson "ordered an incision and drainage ("I&D")" of fluid that had accumulated on his left leg on December 30, 2013, at RJD's triage and treatment area ("TTA"), and that Defendant Cook "ordered a culture test" on January 6, 2014, and scheduled him for a "follow up after discovering MRSA." (*Id.* at 24, 38-39.)

Plaintiff's exhibits show that he first complained of "a big red bump on [his] left leg – behind [his] thigh" on December 29, 2013 (ECF No. 1-1 at 16), and that Robinson examined him on December 30, 2013. (*Id.* at 17-18.) Robinson diagnosed Plaintiff with a left thigh skin abscess and cellulitis, prescribed Bactrim DS for seven days, Tylenol 3 "for one week to cover the discomfort," and "contacted the doctor in the [TTA]," to schedule an "incision and drainage" in 1-2 days. (*Id.* at 18-21.) When Robinson examined him again on January 3, 2014, Plaintiff reported feeling better, but had not yet had the I&D, so

---

broad discretion in interpreting and applying their local rules.'") (quoting *Miranda v. S. Pac. Transp. Co.*, 710 F.2d 516, 521 (9th Cir. 1983)).

Robinson noted she would "contact the TTA" to "make sure that he ha[d] an appointment to prevent recurrence." (*Id.* at 24.) Plaintiff's CDC 7382 "Treatment Record," signed by Dr. Cook, shows that Plaintiff reported to the daily RN line for wound care every day from January 6 through 10, 2014, and again on January 15, 2014, and notes that he was "healing progressively." (*Id.* at 29, 31, 35-36.) Dr. Robinson's Progress Notes dated January 10, 2014, and February 10, 2014, indicate that the I&D procedure was performed sometime between January 3, 2014 and January 10, 2014, and that Plaintiff "had the blood test with MRSA on 01/06/2014; however the antibiotic resistance pattern stated there was only scant growth of MRSA." (*Id.* at 41, 54.) Plaintiff also "had several comprehensive metabolic panels and CBCs from 01/06/2014 to 01/27/2014 and all were normal save very minor elevations in transaminases less than 2 times the upper limit of normal." (*Id.* at 54.) Therefore, as of February 10, 2014, Robinson noted Plaintiff's skin abscess had "resolved," counseled him as to a "cosmetic" toenail fungus condition, noted he "fel[t] well," was "not taking any medication," and needed only a "well male" check up in one year. (*Id.* at 54, 55.)

**B.      Right Leg & Knee – March 2014 to August 2015**

Plaintiff further claims Dr. Robinson, as well as other RJD primary care providers, Defendants Chau, Suleiman, Newton, Casian, Zhang, Ghayouri, Wiley, and Newton, and AMC doctors Butera and Hood, all "had actual knowledge of [his] staph/MRSA infection," knew that he was "in need of immediate medical care," and failed to take "reasonable action to summon such medical care" in relation to his right leg and knee from March 2014 through August 2015. (ECF No. 1 at 25.) Plaintiff contends their "deliberate indifferen[ce]" to his MRSA infection, caused him "to suffer prolonged and extreme pain," "unnecessary complications," and two hospitalizations at AMC – once in May 2014, and once again in September 2014, where he underwent surgery. (*Id.* at 25-26, 40-45.)

Plaintiff's exhibits show that on March 24, 2014, he submitted a CDC 7362 Health Care Services Request Form, No. 0341064, in which he claimed to have "caught staph again," and reported an "abscess in [his] right leg," headaches, pain, and irritation. (ECF

No. 1-1 at 61; ECF No. 1 at 26.) Plaintiff was examined by an unidentified nurse on March 26, 2016, who "consulted with PCP [primary care physician] on site." (ECF No. 1-1 at 63.) Plaintiff was prescribed Bactrin and directed to follow up in 5 days. (*Id.* at 63-64.) His exhibits show he was next examined by RN Kaestner on April 1, 2014, who changed his dressings, instructed him on proper wound care, and discharged him back to housing. (*Id.* at 65.)

One month later, on May 2, 2014, Plaintiff submitted another CDC 7362, marked "emergency," and designated No. 1735990 to RN Benitez. (ECF No. 1 at 28; ECF No. 1-1 at 66, 77.) Plaintiff reported swelling and "severe pain" in his right knee and difficulty walking. (ECF No. 1-1 at 28, 41-42.) Plaintiff was examined in the TTA by G. Wiley, NP and Dr. Karan.[3] Karan "attempted a tap[] at the sub patellar space," but "no fluid was noted." (*Id.* at 68; ECF No. 1 at 28.) Plaintiff's May 2, 2014 Progress Notes further indicate that an "aseptic technique along with 1% lidocaine" was used, and his knee was x-rayed. (ECF No. 1-1 at 68, 70-71.) The x-rays showed "prepatellar soft tissue swelling," but no fracture. (*Id.* at 70-71.) Plaintiff was diagnosed with prepatellar cellulitis[4] and bursitis, ordered to undergo a "CBC w/diff" and prescribed rochepin, Keflex, toradol, acetaminophen with codeine phosphate, and naproxyn.[5] (ECF No. 1 at 41; ECF No. 1-1 at 67, 68, 73, 79.) Plaintiff was further advised to follow up in 5 days, advised to elevate his

---

[3] Dr. Karan is alleged to have treated Plaintiff's right knee at RJD on May 2, 2014, (*id.* at 28), but he is not included in the portion of Plaintiff's pleading that identifies Defendants. (*Id.* at 9-17.) Consequently, Dr. Karan was not included in the summons which issued on March 22, 2016 (ECF No. 4), and has not been served.

[4] Plaintiff claims cellulitis is a bacterial infection of the skin and underlying tissue that is treated with antibiotics. (ECF No. 1 at 28 n.1.)

[5] According to Plaintiff, Keflex is the brand name for the antibiotic cephalexin which "is used to treat pneumonia and bone, ear[,] skin and urinary tract infections." (ECF No. 1 at 41.) "Naproxyn is a nonsteroidal anti-inflammatory drug or NSAID, used to relieve pain, inflammation, fever, or stiffness." (*Id.* at 41-42.)

knee, apply cool compress[es], rest, and "take meds as prescribed." (*Id.* at 68.) On the following day, May 3, 2014, Plaintiff's wound was checked and he was advised to "f/u [with] PCP Monday." (*Id.* at 75.)

On May 4, 2014, however, when Plaintiff "walk[ed] in TTA for wound check," he was referred to Dr. Casian by RN Garcia. (ECF No. 1 at 29, ECF No. 1-1 at 80-84.) Plaintiff claims his "whole right leg was swollen" and he was authorized for outpatient care "via state vehicle" to AMC. (ECF No. 1 at 42, ECF No. 1-1 at 80-84, 96.)

Once he arrived at AMC on May 4, 2014, Plaintiff was examined by Defendant Dr. Hood, diagnosed with "cellulitis of the right knee and leg," prescribed "IV antibiotics," admitted to the "Med/Surg floor," and referred to Defendant Dr. Butera, an infectious disease specialist. (ECF No. 1 at 29-30, 42; ECF No. 1-1 at 85-86, 92-93.) Dr. Hood's History and Physical notes indicate Plaintiff had been previously treated "for some type of infected lesion in his right leg that recurred three months [prior]," and which was "treated with oral antibiotics." (ECF No. 1-1 at 85.) Dr. Hood also noted Plaintiff was currently taking Tylenol with codeine, cephalexin, and naprosyn, but that he had swelling of the right knee around the patella, a "raised erythematous area measuring about 2 cm," an area that "appeared to be purulent," and "some erythema, several centimeters above and below the knee," but an X-ray of the knee "showed no acute findings." (*Id.* at 86.)

Plaintiff admits he was "hospitalized and treated for staph infection with IV antibiotics (vancomycin[6] and Zosyn)" while at AMC. (ECF No. 1 at 29.)

Dr. Hood's discharge notes, dated May 7, 2014, further indicate that "[a]ttempts to aspirate fluid from the joint were unsuccessful," and that an x-ray of Plaintiff's knee "showed no evidence of fluid or osteoarthritis." (ECF No. 1-1 at 93.) Dr. Hood's notes further confirm Plaintiff was "empirically placed on IV vancomycin and Zosyn," in consult ///

_____

[6] Plaintiff contends that vancomycin "is an antibiotic" and "the only drug that deals with MRSA." (ECF No. 1 at 29 n.2.)

with Dr. Butera, who recommended at least two days of IV antibiotics, which Plaintiff completed during his stay at AMC. (*Id.*)

Dr. Butera's consultation notes indicate that "two sets of [Plaintiff's] blood cultures" were "negative and nares MRSA screen [was] in progress with a preliminary negative." (ECF No. 1-1 at 105.) Dr. Butera assessed Plaintiff with:

> Probable acute prepatellar septic bursitis of the right knee in the setting of a small knee abrasion and scab. These are almost always Staphylococcus aureus. The patient's nares methicillin-resistant Staphylococcus aureus screen is negative. Though he was actually getting worse on Keflex, it may be we just were not getting adequate drug levels into the bursa with the Keflex.

(*Id.*)

Dr. Butera "discontinue[d] the broad-spectrum Zosyn" on May 6, 2014, and "switched [him] to Ancef along with vancomycin" in order "observe at least another day before considering changing to p.o." (ECF No. 1-1 at 105.) Butera noted that "[g]enerally a two-week course of therapy of antibiotics appropriate to cover the pathogen is necessary," and that it is "sometimes necessary to incise and drain the bursa," however, Plaintiff was "rapidly improving on IV therapy with no definite drainable fluid collection." (*Id.*)

Therefore, on May 7, 2014, Dr. Hood discharged Plaintiff with "acute bursitis/cellulitis, right knee," which had "markedly improved" and "started [him] on oral antibiotics." (*Id.* at 93.) "Infectious disease recommended Keflex 500 mg q.i.d. for 10 days and doxycycline 100 mg b.i.d. for 10 days," together with Tylenol with codeine for pain and naprosyn. (*Id.*)

Plaintiff returned to RJD "on the night of May 7, 2014," and admits he was given "antibiotic pills." (ECF No. 1 at 29.) Plaintiff was examined by RN Stewart and Dr. Chau, and ordered to follow up with his PCP in 5 days. (ECF No. 1-1 at 107.) A "Medication Reconciliation" sheet dated May 9, 2014 indicates Dr. Chau discontinued Plaintiff's prescription for naproxen, renewed his prescription for acetaminophen with codeine, and prescribed a ten-day course of cephalexin and doxycycline hyclate. (ECF No. 1-1 at 108.)

Plaintiff claims after May 7, 2014 his "condition made a turn for the worse." (ECF No. 1 at 29.) His exhibits show that he was examined by Dr. Ghayouri, his PCP, on May 9, 2014, and again on May 16, 2014. (*Id.* at 112; ECF Doc. No. 1-2 at 1-4.) Both times, Dr. Ghayouri noted Plaintiff's "right knee cellulitis [was] improving," that Plaintiff "report[ed] significant improvement in pain, redness, and swelling," and "den[ied] any complaint." Dr. Ghayouri continued his acetaminophen, cephalexin, and doxycycline prescriptions, as well as his prescription for naproxen "as needed for pain." (ECF No. 1-1 at 112-13; ECF No. 1-2 at 4.)

Approximately one month later, on July 15, 2014, Plaintiff "submitted a medical slip (CDC 7362) complaining again of pain in his right knee," inflammation, and trouble walking. (ECF No. 1 at 29; ECF No. 1-2 at 6.) Plaintiff "called to the clinic" and was evaluated by Defendant Paule, RN on July 17, 2014. (ECF No. 1 at 30). Plaintiff claims to have "explained his severe pain and swelling," to have informed Paule of his "prior history of infection" and to have told Paule "it was urgent" that he see a doctor. (ECF No. 1 at 30.) The "Encounter Form" completed by Paule and dated July 17, 2014, reflects Plaintiff's complaints of pain and swelling in his right knee, as well as his history of "septic pre-patellar bursitis." (ECF No. 1-2 at 12.) Paule noted that Plaintiff requested "possible ultrasound of MRI," because he was "worried about last incident of right knee bursitis," and claimed Ibuprofen gave him "no symptomatic relief," therefore "he would rather wait to see PCP before taking anything." (*Id.*) Paule further noted Plaintiff's knees appeared symmetrical, "both lower extremities [were] within normal limits," that he was "able to walk without difficulty," and was "given instructions of signs and symptons to … monitor." (*Id.* at 13.) Plaintiff claims Paule "intentionally and unjustifiably failed to summon medical care" on this occasion, but he also admits, and his exhibits show that Paule "scheduled [him for] an appointment with the doctor." (ECF No. 1 at 30; ECF No. 1-2 at 13.)

Plaintiff claims he was "finally called and seen by Defendant Zhang" on September 15, 2014. (ECF No. 1 at 30.) Plaintiff claims he "communicated … his whole medical history," and requested a "cat scan or MRI to see if the infection had developed." (*Id.* at

31.) Plaintiff admits Zhang ordered an x-ray and "inspected" his knee, but "told [him] he was fine," and only recommended resting and weight loss. (*Id.*)

Dr. Zhang's Progress Notes dated September 15, 2014, include Plaintiff's previous diagnosis of "right knee cellulitis" and his complaints of "intermittent right knee pain." (ECF No. 1-2 at 7.) Zhang further noted Plaintiff "ambulat[ed] to the room … without any signs of difficulty or any signs of pain," but he ordered a "repeat x-ray of the right knee," a "CBC and ESR," a "trial of etodolac 300 mg," and recommended Plaintiff "follow up "in 90 days or earlier if needed." (*Id.* at 7-11, 14.)

Plaintiff's x-ray results, dated September 18, 2014, showed "no acute fracture or dislocation," no "significant degenerative changes," and "no large joint effusion," but "[s]oft tissue swelling [wa]s present." (*Id.* at 15.) Plaintiff claims that because this x-ray indicated "everything seem[ed] to be fine," he "assumed" Dr. Zhang "thought that he was lying, and [he] never heard from him again." (ECF No. 1 at 31.)

On September 25, 2014, Plaintiff claims he experienced "major headaches, fever, chills, and excruciating pain," but unidentified medical staff "refused to see [him] unless he had a life-threatening problem." (ECF No. 1 at 31.) Three days later, on September 28, 2014, when he "could not take the pain or hang on any longer," Plaintiff's celly, Ray Maldonado, called a "man down." (*Id.* at 32.) Plaintiff claims RJD Officer De La Cruz responded and two unidentified nurses "finally attended [to his] medical needs." (*Id.*)

Plaintiff's exhibits show he was examined by RN Wenzel at 8:40 am, and complained of both chest and right knee pain. Wenzel noted Plaintiff's history of cellulitis/bursitis, his May 2015 hospitalization, that he previously "d[id] well" on antibiotics, and was "last seen by PCP two weeks ago and was doing well." (ECF No. 1-2 at 17.) Wenzel noted "obvious prepatellar swelling." (*Id.*) At 9:15 am, Wenzel's notes indicate Plaintiff was examined by Dr. Suleiman. (*Id.*) Suleiman noted Plaintiff's "history of knee cellulitis" and noted he "might have a subcutaneous abscess versus developing septic arthritis," and therefore authorized Plaintiff's transfer to the ER at AMC "for further ///

evaluation and possible arthrocentesis or incision and drainage of that area." Dr. Suleiman further noted Plaintiff would "need IV antibiotics initially." (ECF No. 1-2 at 16, 21-23.)

At 11:15 am, on September 28, 2014, Dr. Christopher Dewar[7] diagnosed Plaintiff with prepatellar bursitis after evaluating him in the ER at AMC. (ECF No. 1-2 at 26-17.) Dr. Dewar's encounter notes state:

> Basically, the patient is a 23-year-old male who is presenting with right knee infection. I feel he is extremely low risk of septic arthritis. He has full range of motion. He has no fever. He has a normal white count. His sedimentation rate and CRP are not dramatically elevated. We consulted Dr. Butera from infectious disease. He agrees with this. We will start him on vancomycin. I did use ChloraPrep to cleanse the knee and used an 18-gauge needle deroof this abscess and a clean pus was taken from the wound site. It was not a large abscess that was able to be drained.

(*Id.*)

AMC Dr. Richard O. Butcher's[8] History and Physical Notes, also dated September 28, 2014, describe Plaintiff's previous admission in May 2014, his 2-day course of IV antibiotics, his May 2014 consultation with Dr. Butera, and his continuation of oral medications for 2 weeks post-discharge.  (ECF No. 1-2 at 29.) Plaintiff told Butcher "he has done well for a while" and suffered no trauma to the knee, but that "all of a sudden," it began being painful and swollen. (*Id.*) Butcher noted Plaintiff "was on etodolac 300 mg" for pain prior to admission, and was given a dose of vancomycin "after cultures were taken" from the wound site in ER. (*Id.* at 30.) Butcher then noted "Infectious Disease will ask Orthopedics to check the patient because if alleged septic arthritis," but Butcher "d[id] not feel that he ha[d] this," because Plaintiff was "stable otherwise." (*Id.*) Butcher also prescribed Motrin and Norco, found Plaintiff "stable for admission," and ordered a "repeat [of Plaintiff's] labs in the morning." (*Id.*)

---

[7] Dr. Dewar is not named as a Defendant.
[8] Dr. Butcher is not named as a Defendant.

Dr. Butera's consultation assessment, also dated September 28, 2014, recounts Plaintiff's May 2014 admission, Butera's prior diagnosis of "acute prepatellar bursitis to the right knee in the setting of a small skin abrasion and scab," which he felt "was almost always due to Staphylococcus aureus," as well as Plaintiff's "negative nares MRSA screen." (ECF No. 1-2 at 36.) Butera noted that in May "there was no definite drainable fluid," and therefore, "no surgical cultures," but Plaintiff's "cellutitic component improved dramatically" due to a 4-day course of IV antibiotic therapy, followed by 10 days of Keflex and doxycycline. (*Id.*) Plaintiff admitted to Butera that "the pain in his knees as well as the induration and erythema did resolve completely," but that he had "over the past two weeks," developed discomfort in the right knee again. (*Id.*) Plaintiff further reported "no fever, chills or rigors," but "over the last few days, [] developed new induration, erythema, and possibly some early fluctuance over the right knee without any pustule or breaks in the skin, or other trauma." (*Id.*) Butera noted that Plaintiff "was sent to the ER again as a possible septic arthritis," and that [h]e had a similar episode back in January, which would make this as third recurrence." (*Id.*)

Dr. Butera assessed Plaintiff with "[r]ecurring inflammation in the soft tissues over the right patella" which "probably represent[ed] a relapsing prepatellar septic bursitis," which "are almost always due to Staphylococcus aureus." (*Id.* at 37.) Butera further noted however, that "previous MRSA screenings ha[d] been negative" and "blood cultures done during [Plaintiff's] last admission were negative," but "repeat blood cultures done during this admission [we]re pending," and it appeared Plaintiff was "developing [a] subcutaneous fluctuant area that may be evolving into a drainable fluid collection or at least, the fluid collection can be aspirated for culture." (*Id.*) Because it was Plaintiff's "third relapse with the similar presentation," Butera noted "at some point, proper incision and drainage or bursectomy may need to be considered." But because Plaintiff did "not appear to be septic with no fever and normal white count," Dr. Butera recommended Plaintiff be

///

///

1    observed, that warm compresses be applied, that he continue on vacomycin IV,[9] and

2    referred for an orthopedic consult. (*Id.*)

3         Plaintiff remained on IV vancomycin and on September 30, 2014, he was evaluated

4    by Dr. Roman B. Cham, an AMC surgeon and orthopedist.[10] (ECF No. 1 at 45; ECF No.

5    1-2 at 40.) Dr. Cham's consultation notes indicate that Plaintiff's infection "look[ed]

6    better," but Dr. Butera "recommended excision of the septic bursitis in part because of the

7    previous failed treatment." (ECF No. 1-2 at 40.) Dr. Cham's notes also show that Plaintiff's

8    "wound culture from 09/28/2104 [wa]s positive for MRSA." (*Id.*) Plaintiff gave "full

9    informed consent for the surgery." (*Id.*)

10        Dr. Cham performed an excision of Plaintiff's right knee at AMC on October 1,

11   2014. (ECF No. 1 at 32-33; ECF No. 1-2 at 41.) Cham's Operative Report shows Plaintiff

12   was anesthetized, "all questionable tissue down to [Plaintiff's] patellar tendon" was

13   removed, and the "wound was irrigated with triple antibiotic solution, which included

14   gentamicin and vancomycin." (ECF No. 1-2 at 41.) "The conclusion appeared to be [a]

15   very clean wound." (*Id.*)

16        Plaintiff was discharged from AMC and returned to RJD "late at night" on October

17   2, 2014. (ECF No. 1 at 33; ECF No. 1-2 at 48.) AMC Dr. Butcher noted Plaintiff had done

18   well postoperatively, and noted he was ambulatory but "should lie [i]n for two weeks."

19   (ECF No. 1-2 at 48.) Plaintiff's discharge medications included Tylenol, Tylenol with

20   codeine, a seven day course of doxycycline, bactroban, and rifampin, Motrin, and Prilosec.

21   (*Id.* at 48-49.)

22   ///

23   ///

24   _____

25   [9] Dr. Butera also considered ceftaroline, but "preferred not to use [it]" because it "is

26   basically too broad spectrum similar to Rocephin, [and] covers many enteric gram-negative

27   rods and other pathogens" that did "not need to [be] cover[ed] in this setting." (ECF No.
     1-2 at 37.)

28   [10] Dr. Cham is not named as a Defendant.

Plaintiff claims that when he returned to RJD, he was given antibiotics, but no pain medication. (ECF No. 1 at 33.) He later admits, however, that Drs. Zhang and Newton "prescribed medication for [him]" "from October 2-6, 2014." (*Id.* at 45.)

The CDC 7230 Interdisciplinary Progress Notes, CDC 7221 Physician's Orders attached to his Complaint, however, show that Plaintiff's prescriptions for doxycycline, rifampin, and Tylenol #3 were ordered by M. Garikaparthi, M.D.[11] upon his return to custody on October 2, 2104, and that he was treated by RNs Janasco, Paule, and Wallace for wound care and dressing changes on October 3, 2014, October 4, 2014, and October 5, 2014. When Plaintiff appeared at his 5-day follow-up on October 6, 2014, he reported he was "taking antibiotics," complained of pain, was given "T#3 bid for 3 days," assigned to a temporary bottom bunk, authorized to use a wooden cane for 3 months, told to continue daily dressing changes "per RN line," advised his sutures would be removed in 2 weeks, that he'd have a telemed follow–up appointment with AMC Dr. Cham in 3 weeks, and another follow up with his PCP in 30 days. (ECF No. No. 1 at 45-46; ECF No. 1-2 at 65-68.)

On October 7, 2014, Plaintiff filed a CDCR 602 HC Appeal, Log No. 14052082, complaining of "negligence" and "deliberate indifference" to his right knee infection. (ECF No. 1-1 at 2-5.) On October 9, 2014, Plaintiff was informed that his lab work results were "essentially within normal limits." (ECF No. 1-2 at 75). On October 16, 2014, his sutures were removed. Plaintiff tolerated the procedure well and his incision appeared to be healing well with no redness or swelling noted. (ECF No. 1-2 at 72.)

On October 17, 2014, Plaintiff had a follow-up appointment with Dr. Zhang, his PCP (*Id.* at 72, 74, 77.) Dr. Zhang's Progress Notes include reference to Plaintiff's "Medical 602" requesting "stronger pain medication," but otherwise document his "unremarkable" lab work, completed course of doxycycline, and improvement of the infection. (*Id.* at 77.)

---

[11]  Dr. Garikaparthi is not named as a Defendant.

Zhang further noted that Plaintiff was ambulating with the use of his cane, able to move his right knee freely, and that there did not appear to be any sign of decrease in his range of motion. (*Id.*) Zhang advised Plaintiff to "continue ibuprofen 600 mg" and added a "Tylenol No. 3 x5 days one p.o. at bedtime." Zhang also started Plaintiff "on nortriptyline 25 mg one p.o. at bedtime for adjunct pain control." (*Id.*) Plaintiff was "concerned about recurrence of infection," and advised to alert medical staff if his knee became warm, red, or swollen, or if he had a fever. Zhang also cautioned that Plaintiff "will continue to have intermittent pain; however, that d[id] not mean he ha[d] an active infection. (*Id.*)

On October 21, 2014, Plaintiff "present[ed] to telemedicine" for his post-operative follow-up with Dr. Cham at AMC. (ECF No. 1 at 46; ECF No. 1-2 at 78-79.) Dr. Cham noted Plaintiff "was doing quite well," "[h]is incision and knee look[ed] completely benign," and he "had no complaints." (ECF No. 1-2 at 79.) Cham noted Plaintiff's "yard doctor want[ed] to keep him on the antibiotics for an additional two weeks," but Cham concluded "no additional orthopedic follow[-]up [wa]s needed." (*Id.*)

Plaintiff was next examined on November 4, 2014 by Dr. Zhang for his "PCP follow-up from [his] recent visit with orthopedic surgeon." (ECF No. 1 at 46-47; ECF No. 1-2 at 82.) Zhang noted Plaintiff's "septic arthritis of the right knee currently resolved," that he was doing well and ambulated without any signs of limping. Plaintiff was advised to alert medical immediately if redness or pain returned. (ECF No. 1-2 at 82.)

Two months later, on January 4, 2015, Plaintiff "submitted a medical slip number 1037871 because of constant pain to his right knee." (ECF No. 1 at 47; ECF No. 1-2 at 87.) Plaintiff was examined by RN Calderon on January 6, 2015, whom he claims "intentionally and unjustifiably failed to summon medical care for [his] excruciating pain." (ECF No. 1 at 47.) The CDC 7362 attached to his pleading, however, indicates Calderon recorded Plaintiff's complaints, noted he was ambulating with a steady gait, and did not appear to need a cane. She prescribed Naproxen 220 mg, instructed him to follow-up in RN clinic of symptoms persisted, and referred him for a routine PCP follow-up. (ECF No. 1-2 at 87-90.)

On January 20, 2015, Plaintiff was again examined by his PCP, Dr. Zhang. (ECF No. 1 at 47; ECF No. 1-2 at 92.) Zhang noted Plaintiff's reports of pain in his right knee which was "worse if he plac[ed] pressure on it," but no increase in temperature, signs of limp, slowness, or any functional impairment. (ECF No. 1-2 at 92.) Zhang noted no signs of active infection, but that Plaintiff complained of pain "despite trial of Tylenol, Motrin, and Naprosyn." (*Id*.) Zhang therefore prescribed a "trial of Voltaren gel," and advised Plaintiff to "avoid jumping" or putting pressure on his right knee whenever possible. (*Id*. at 92-96.) Plaintiff admits Zhang also approved him for a bottom bunk, but claims he "failed to prescribe effective pain medication or summon medical care for [his] pain." (ECF No. 1 at 47.)

Plaintiff next claims to have seen Dr. Wiley on May 20, 2015, and reported that he "was unable to bear total weight on his right leg." (ECF No. 48.) The CDCR 7230-M attached to his complaint, however, shows that Plaintiff reported to Wiley on that day, and complained of a history of pain and swelling that "never actually resolved" but which had been exacerbated by his "playing soccer." (ECF No. 1-2 at 99.) Dr. Wiley ordered Tylenol for pain, and that a large permanent neoprene knee support brace be "expedited" for Plaintiff's use. (*Id*. at 99-100.)

Finally, on August 3, 2015, Plaintiff submitted yet another CDC 7362, No. 2121359, requesting that he "talk to [his] prime physician regarding [his] medication and treatment." (ECF No. 1 at 48; ECF No. 1-2 at 101.) RN Gines[12] assessed Plaintiff's complaints of "chronic knee pain" on August 6, 2015, prescribed Naproxen, and advised him to notify staff "asap " if swelling or redness returned. (ECF No. 1-2 at 102-04.) Plaintiff's knee pain was next evaluated by an unidentified doctor on August 14, 2105. (ECF No. 1 at 48; ECF No. 1-2 at 105.) Plaintiff complained that Tylenol did not alleviate his "dull and aching" knee pain, but reported to "playing sports every day." (ECF No. 1-2 at 105.) The doctor

---

[12]  RN Gines is not named as a Defendant.

recommended trying Motrin and sulindac, weight loss, and explained that Plaintiff's right knee "will never be equal to the left" due to his past infection. (Id.) Plaintiff "was not happy with his explanation because he requested … medical care [on] numerous occasions before the infection became out of control." (ECF No. 1 at 48.)

### C.     Supervisory and/or Administrative Medical Officials

In addition to the doctors and nurses who are alleged to have treated him between 2013 and 2015, Plaintiff also contends Defendants Walker, RJD's Chief Physician and Surgeon,  Roberts, a Chief Medical Executive, and Glynn, a Chief Executive Officer, "failed to instruct" the other RJD medical officials "on how to treat or identify MRSA infection," (ECF No. 1 at 2, 27), and "negligently failed to monitor and supervise the inadequate and untimely medical care" he received, by reviewing and denying, together with Defendant Zhang, his CDCR-602 HC Inmate/Parolee Health Care Appeal Log No. 14052082 (Id. at 10-14, 40-41; *see also* ECF No. 1-1 at 2-11).

### D.     RNs

Finally, as to the RNs who are alleged to have assessed and examined him on various occasions, Plaintiff claims Defendants Paule, Janasco, Calderon, Kaestner, Benitez, Garcia, Wallace, Wenzel, Manning, and Steward "were responsible for providing [him] health care" from 2013 through 2015, but he "does not know the level of injury and/or damages" they caused. (Id. at 15.)

## II.   Causes of Action

Plaintiff divides his pleading into three separate causes of action. First, he claims all Defendants acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment of the U.S. Constitution. ("First Cause of Action"). (ECF No. 1 at 21-37.) Second, Plaintiff claims all Defendants committed "medical negligence" and "malpractice" in violation of CAL. GOVT. CODE §§ 845.6 and 815.2 ("Second Cause of Action"). (Id. at 37-50.) Third, Plaintiff claims Defendants violated his rights to due process and to be free from cruel and unusual punishment in violation of CAL. CONST. Art. I. §§ 15, 17 ("Third Cause of Action"). (Id. at 50-51.)

**III.   Prayer for Relief**

Plaintiff seeks a declaratory and injunctive relief, as well as nominal, presumed, punitive, and "mental and emotional" damages against each Defendant "jointly or severally." (ECF No. 1 at 51-53.)

<u>**Discussion**</u>

**IV.   Legal Standards**

**A.   Rule 12(b)(6) Motion to Dismiss**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Because Rule 12(b)(6) focuses on the "sufficiency" of a claim rather than the claim's substantive merits, "a court may [ordinarily] look only at the face of the complaint to decide a motion to dismiss." *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002). However, courts may consider exhibits that are attached to the complaint. *See* FED. R. CIV. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citing *Amfac Mortg. Corp. v. Ariz. Mall of Tempe, Inc.*, 583 F.2d 426 (9th Cir. 1978) ("[M]aterial which is properly submitted as part of the complaint may be considered" in ruling on a Rule 12(b)(6) motion to dismiss.) However, exhibits that contradict the allegations of a complaint may fatally undermine the complaint's allegations. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (a plaintiff can "plead himself out of a claim by including . . . details contrary to his claims." (citing *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998) (courts "are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint."))); *see also Nat'l Assoc. for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1049 (9th Cir.2000) (courts "may consider facts contained in documents attached to the complaint" to determining whether the complaint states a claim for relief).

///

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)).

"All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996) (citing *Nat'l Wildlife Fed. v. Espy*, 45 F.3d 1337, 1340 (9th Cir. 1995)). The Court need not, however, "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell*, 266 F.3d at 988 (citing *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994)); *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (on motion to dismiss, court is "not bound to accept as true a legal conclusion couched as a factual allegation."). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Thus, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 570 (when a plaintiff has not

///

"nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed.")).

"In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences [drawn] from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. United States Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

## B.   *Pro Se* **Litigants**

"In civil rights cases where the plaintiff appears pro se, the court must construe the pleadings liberally and must afford [the] plaintiff the benefit of any doubt." *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988). The rule of liberal construction is "particularly important in civil rights cases." *Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992). The rule, however, "applies only to a plaintiff's factual allegations." *Neitzke v. Williams*, 490 U.S. 319, 330 n.9 (1989). In giving liberal interpretation to a *pro se* civil rights complaint, courts may not "supply essential elements of claims that were not initially pled." *Ivey v. Bd. of Regents of the Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982). "Vague and conclusory allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss." *Id.*; *see also Jones v. Cmty. Redev. Agency*, 733 F.2d 646, 649 (9th Cir. 1984) (finding conclusory allegations unsupported by facts insufficient to state a claim under § 1983).

## V.   **Defendants' Motions**

Both AMC Doctors Hood and Butera move to dismiss Plaintiff's first cause of action alleging deliberate indifference to his serious medical needs in violation of the Eighth Amendment, (ECF No. 8-1 at 4-6; ECF No. 10-1 at 4-6), his third cause of action alleging violations of the California Constitution's Articles 15 and 17, (ECF No. 8-1 at 6-8; ECF No. 10-1 at 7), and to strike his request for punitive damages pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 8-1 at 8-9; ECF No. 10-1 at 7-8.)

As noted above, Plaintiff has filed no Opposition.

///

**A.   Eighth Amendment Inadequate Medical Care Claims**

    **1.   Standard of Review**

Only "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 103, 104 (1976) (citation and internal quotation marks omitted). "A determination of 'deliberate indifference' involves an examination of two elements: (1) the seriousness of the prisoner's medical need and (2) the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1991), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc) (quoting *Estelle*, 429 U.S. at 104); *see also Wilhelm v. Rotman*, 680 F.3d 1108, 1113 (9th Cir. 2012); *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

First, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992), citing *Estelle*, 429 U.S. at 103-104. "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 914 F.2d at 1059 (quoting *Estelle*, 429 U.S. at 104). "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment." *Id.*, citing *Wood v. Housewright*, 900 F.2d 1332, 1337-41 (9th Cir. 1990); *Hunt v. Dental Dept.*, 865 F.2d 198, 200-01 (9th Cir. 1989).

Here, neither Dr. Hood nor Dr. Butera argue that Plaintiff has failed to allege facts to plausibly show that his medical needs were 'serious,' and the Court finds Plaintiff's Complaint is sufficiently pleaded in this regard. *See e.g., Sansome v. Lopez,* No. CV 1-07-1086-FRZ, 2013 WL 3198594, at *4 (E.D. Cal. June 21, 2013) (finding prisoner's claims of having developed "(staph) MRSA infections" to be serious medical needs because "an

infection, if not properly treated, 'could result in further significant injury or the unnecessary and wanton infliction of pain.'") (citing *Wilhelm*, 680 F.3d at 1122; *Jett*, 439 F.3d at 1096)); *Amason v. Wedell*, No. 2:12-CV-0388 KJN P, 2014 WL 2987695, at *3 (E.D. Cal. July 1, 2014) (assuming prisoner's "cellulitis, neuropathy, leg, foot, and ankle swelling and pain" were  sufficiently serious medical needs under the Eighth Amendment).

Therefore, the Court must next decide whether Plaintiff's Complaint further contains sufficient "factual content" to show that both Drs. Hood and Butera acted with "deliberate indifference" to his needs. *McGuckin*, 914 F.2d. at 1060; *see also Jett*, 439 F.3d at 1096; *Iqbal*, 556 U.S. at 678. "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).

While Plaintiff claims Drs. Hood and Butera, as well as *all* his RJD doctors, "had actual knowledge of [his] staph/MRSA infection," knew that he was "in need of immediate medical care," and failed to take "reasonable action to summon such medical care" in relation to his right leg and knee from March 2014 through August 2015, (ECF No. 1 at 25), his pleading lacks the "further factual enhancement" which demonstrates either Hood or Butera's "purposeful act[s] or failure[s] to respond to [his] pain or possible medical need," or any "harm caused by [this] indifference." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557); *Wilhelm*, 680 F.3d at 1122 (citing *Jett*, 439 F.3d at 1096). Indeed, Plaintiff's pleading offers only the type of "labels and conclusions" or "formulaic recitation[s] of the elements of a[n] [Eighth Amendment] cause of action that will not do." *Iqbal*, 662 U.S. at 678 (citing *Twombly*, 550 U.S. at 555.)

Moreover, as discussed below, the voluminous exhibits and medical records Plaintiff offers in support of his Complaint show that both Drs. Hood and Butera acted promptly, carefully, and responsibly when they both treated him at AMC on May 4-7, 2014, and when Dr. Butera again treated him upon re-admission to AMC on September 28, 2014. Plaintiff's exhibits belie any plausible claims of deliberate indifference. *Id.; see also Sprewell*, 266 F.3d at 988; *Nat'l Assoc. for the Advancement of Psychoanalysis,* 228 F.3d at 1049 (noting ///

that court "may consider facts contained in documents attached to the complaint" to determine whether a complaint states a claim for relief).

Specifically, Plaintiff claims that "from May 4, 2014 through May 7, 2014, both Drs. Hood and Butera were "responsible" to provide him medical care by diagnosing, evaluating, and exercising their medical judgments as to "the medical care needed." (ECF No. 1 at 15.) Plaintiff's exhibits show both Dr. Hood and Dr. Butera, an infectious disease specialist, examined Plaintiff, reviewed an x-ray of his knee and his current course of oral antibiotics, diagnosed him with cellulitis of the right knee and leg, admitted him to AMC, and in consultation "empirically placed [him] on IV vancomycin and Zosyn." (ECF No. 1 at 29-30; ECF No. 1-1 at 85-86, 92-93.) Only after Plaintiff had "markedly improved" after 3 days of IV antibiotics, did both Drs. Hood and Butera clear him for discharge back to RJD, and prescribe a continued course of oral antibiotic, pain, and inflammation therapy, including Keflex, doxycycline, Tylenol with codeine and Naprosyn, noting that "[g]enerally, a two week course of therapy of antibiotics appropriate to cover the pathogen is necessary." (ECF No. 1-1 at 105.) While Plaintiff concludes both Drs. Hood and Butera were "deliberate[ly] indifferent" because they "failed to identify and treat [his] MRSA infection" in May 2014 (ECF No. 1 at 25), his exhibits show a "nares methicillin-resistant Staphylococcus aureus screen [was] negative" when he was admitted to AMC on May 4, 2014, (ECF No. 1-1 at 105), *and* that both Drs. Hood and Butera aggressively treated his infection with IV Zosyn and vacomycin, the "only drug" he claims that "deals with MRSA." (ECF No. 1 at 29 n.2.)

As to his subsequent admission to AMC on September 28, 2014, Plaintiff again claims Dr. Butera was one of several doctors who were "responsible for [his] medical care." (ECF No. 1 at 25-26.) He also admits Butera "treated [him] with strong antibiotics due to the resistance" of his infection during this hospitalization, (ECF No. 1 at 32, 45), but claims the "MRSA infection was in an advanced stage" requiring surgery. (*Id.* at 26.) Plaintiff's exhibits show that in fact, Dr. Butera did in fact place Plaintiff back on vancomycin IV on September 28, 2014, and noted that Plaintiff's "previous MRSA screenings ha[d] been

3:16-cv-00105-GPC-JMA

negative," but recommended that Plaintiff be observed until his "repeat[ed] blood cultures" could be evaluated, an orthopedist could be consulted to evaluate whether a "proper incision and drainage or bursectomy" was necessary due to Plaintiff's relapse. (ECF No. 1-2 at 36-37, 40.) Plaintiff's exhibits further show that it was not until his September 28, 2014 wound culture that Plaintiff tested "positive for MRSA," and he consented to surgery. (ECF No. 1 at 45; ECF No. 1-2 at 40.)

Plaintiff contends all Defendants, including Drs. Hood and Butera, violated his Eighth Amendment rights because he "believes surgery could have been prevented if he had been treated with adequate medical care since the beginning." (ECF No. 1 at 33.) But, to support a claim of deliberate indifference, Plaintiff must plead facts that demonstrate something more than an ordinary lack of due care. *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012) (citation and quotation marks omitted); *Wilhelm*, 680 F.3d at 1122. "A difference of opinion between a physician and the prisoner–or between medical professionals–concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)); *Wilhelm*, 680 F.3d at 1122-23. Instead, Plaintiff must allege facts sufficient to "show that the course of treatment the [defendants] chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health." *Snow*, 681 F.3d at 988 (citation and internal quotations omitted). "Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights." *Toguchi,* 391 F.3d at 1057 (citation omitted).

Plaintiff's Complaint, together with his exhibits however, contain no facts sufficient to show that either Dr. Hood or Dr. Butera acted with deliberate indifference to his plight by "knowing of and disregarding an[y] excessive risk to his health and safety," or choosing any "medically unacceptable" course of treating his infection in conscious disregard to his health, on either occasion he was admitted to AMC and treated by them. *Farmer*, 511 U.S. at 837; *Snow*, 681 F.3d at 988.

Accordingly, the Court GRANTS both Dr. Hood's and Dr. Butera's Motions to Dismiss Plaintiff's first cause of action based on the Eighth Amendment.

### B.   Cal. Const. Art I §§ 15 & 17 Claims

In his third cause of action, Plaintiff incorporates by reference all factual allegations made in support of his Eighth Amendment claim, and asserts pendent state law claims against all Defendants pursuant to Cal. Const., Art. 1 §§ 15, 17. (ECF No. 1 at 50.) Both Dr. Hood and Dr. Butera also move to dismiss this cause of action pursuant to Fed. R. Civ. P. 12(b)(6). (ECF No. 8-1 at 6-8; ECF No. 10-1 at 7.)

First, section 15 of Article I of the California Constitution provides:

> [t]he defendant in a criminal cause has the right to a speedy public trial, to compel attendance of witnesses in the defendant's behalf, to have the assistance of counsel for the defendant's defense, to be personally present with counsel, and to be confronted with the witnesses against the defendant. The Legislature may provide for the deposition of a witness in the presence of the defendant and the defendant's counsel.

> Persons may not twice be put in jeopardy for the same offense, be compelled in a criminal cause to be a witness against themselves, or be deprived of life, liberty, or property without due process of law.

CAL. CONST., art 1 § 15. Thus, by its own terms, § 15 is applicable only in criminal cases. *See County of Sutter v. Davis*, 234 Cal.App.3d 319, 324 n.2 (1991).

Second, section 17 of the California Constitution, like the Eighth Amendment of the U.S. Constitution, prohibits cruel and unusual punishment. CAL. CONST. art. I § 17. However, there is no private cause of action for money damages under Article I, section 17. *Giraldo v. California Dep't of Corr. and Rehab.*, 168 Cal.App.4th 231, 257, 85 Cal.Rptr.3d 371 (2008) (citing *Katzberg v. Regents of the University of California*, 29 Cal.4th 300, 329, 127 Cal.Rptr.2d 482, 58 P.3d 339 (2002)); *see also Davis v. Kissinger*, 2009 WL 256574, at *12 n. 4 (E.D. Cal. Feb. 3, 2009), *adopted*, 2009 WL 647350 (Mar. 10, 2009). Even though California's cruel or unusual punishment clause represents a significant right, alternative remedies are available to prisoners in the form of a negligence

action or an action for damages under the federal cruel and unusual punishment clause. *Giraldo*, 168 Cal. App. 4th at 257; 85 Cal.Rptr.3d 371. Thus, Plaintiff is precluded from bringing a claim under section 17 of the California Constitution for money damages.

And while relief for violations of Article I, section 17 is not limited to injunctive and declaratory relief, those remedies must be premised on a valid and on-going cruel and unusual punishments violation. *See id*. Because the Court has dismissed Plaintiff's Eighth Amendment cruel and unusual punishments claims as to both Dr. Hood and Dr. Butera, *see In re Alva*, 33 Cal. 4th 254, 291 (2004) ("[W]e have never suggested that article I, section 17 employs a different or broader definition of 'punishment' itself than applies under the Eighth Amendment."), no grounds for injunctive or declaratory relief based on those claims remain. *See e.g., Mwasi v. Corcoran State Prison*, No. 1:13-CV-00695-AWI, 2015 WL 3419203, at *7 (E.D. Cal. May 27, 2015).

Accordingly, the Court GRANTS both Dr. Hood's and Dr. Butera's Motions to Dismiss Plaintiff's third cause of action pursuant to Cal. Const., art 1 §§ 15, 17.

### C.   Punitive Damages

Finally, Dr. Hood and Dr. Butera both move to dismiss Plaintiff's request for punitive damages pursuant to FED. R. CIV. P. 12(b)(6) because he has failed to allege facts sufficient to show that either of them acted with the requisite culpability. (ECF No. 8-1 at 8-9; ECF No. 10-1 at 7-8.) Punitive damages may be assessed in § 1983 actions "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).

Because the Court has found Plaintiff's Complaint fails to state facts sufficient to show that either Dr. Hood or Dr. Butera acted with deliberate indifference to his serious medical needs, let alone any "evil motive or intent," it DENIES their Motions to dismiss Plaintiff's claims for punitive damages based on his Eighth Amendment claims as moot.

///

///

## VI.  Sua Sponte Screening per 28 U.S.C. § 1915(e)(2)

Plaintiff is proceeding IFP in this case pursuant to 28 U.S.C. § 1915(a) (ECF No. 3). On March 22, 2016, the Court conducted a sua sponte review of Plaintiff's Complaint soon after filing, and found it contained Eighth Amendment medical care claims sufficient to overcome the "low threshold" for surviving the initial sua sponte screening required by 28 U.S.C. §§ 1915(e)(2) and 1915A(b), (*id.* at 5 (citing *Wilhelm*, 680 F.3d at 1123)), and directed the U.S. Marshal to effect service upon Defendants on Plaintiff's behalf. *Id.* at 5-7. Plaintiff was cautioned, however, that "the sua sponte screening and dismissal procedure is cumulative of, and not a substitute for, any subsequent Rule 12(b)(6) motion that [a defendant] may choose to bring." (*Id.* at 5 n.1 (citing *Teahan v. Wilhelm*, 481 F. Supp. 2d 1115, 1119 (S.D. Cal. 2007)).

As noted previously, no Defendants named in Plaintiff's Complaint, other than Dr. Hood and Dr. Butera, have yet to be served. *See supra* n.1. As a result of having since carefully considered all the allegations in Plaintiff's Complaint, together with all the medical records he has attached as exhibits as the result of Dr. Hood and Dr. Butera's Motions to Dismiss, the Court now finds that it must also sua sponte dismiss the remainder of Plaintiff's claims as to all other named, but yet-to-be-served Defendants pursuant to 28 U.S.C. § 1915(e)(2)(b)(ii) for failing to state a claim upon which relief may be granted. *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) ("It is also clear that section 1915(e) not only permits but *requires* a district court to [sua sponte] dismiss an in forma pauperis complaint" "at any time" if the court determines that it fails to state a claim) (citing 28 U.S.C. § 1915(e)(2)(B)(ii); *see also Chavez v. Robinson*, 817 F.3d 1162, 1167 (9th Cir. 2016) ("The statute governing IFP filings requires a court to dismiss an action 'at any time' if it determines that the complaint 'seeks monetary relief against a defendant who is immune from such relief.'") (citing 28 U.S.C. § 1915(e)(2)(B)(iii)), and even "before the defendants have been served and affirmatively raised the issue in a responsive pleading.").

///

///

## A.     Standard of Review

"The standard for determining whether a plaintiff has failed to state a claim upon which relief can be granted under § 1915(e)(2)(B)(ii) is the same as the Federal Rule of Civil Procedure 12(b)(6) standard for failure to state a claim." *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012).

To state an Eighth Amendment claim based on allegations of inadequate medical care, Plaintiff's Complaint must contain sufficient factual content to show that *all* the RJD medical officials he has named as Defendants, just like AMC Drs. Hood and Butera, acted with deliberate indifference to his serious medical needs. *Estelle*, 429 U.S. at 104; *Peralta v. Dillard*, 744 F.3d 1076, 1081 (9th Cir. 2014) (en banc).

## B.     Remaining Claims against Unserved Defendants

Plaintiff's Eighth Amendment claims as to the named RJD Defendants can be classified into three separate chronological incidents: 1) his December 2013 through February 2014 left leg abscess, for which he alleges to have been treated by RJD Drs. Robinson, Silva, and Cook; 2) his May through September 2014 pre- and post- AMC admission for right knee and leg care, for which he alleges to have been treated by RJD Drs. Casian, Chau, Ghayori, Wiley, and Zhang, and RNs Paule, Kaestner, Benitez, Garcia, and Steward; and 3) his pre- and post-September 28, 2014 re-admission to AMC for recurrent pain and swelling in his right knee and leg, for which he alleges to have been treated by RJD Drs. Zhang, Newton, Suleiman and Wiley and RNs Wenzel, Paule, Janasco, Wallace, and Calderon.[13] As to the remaining named Defendants, RJD's Chief Medical

---

[13]  Plaintiff includes B. Manning in a list of RNs he names as Defendants, (ECF No. 1 at 15), and alleges he/she "was responsible for providing [him] health care," (*id.*) but nowhere else in his Complaint, or in the exhibits attached, does Plaintiff allege or show when he was actually treated by Manning. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("Liability under [§] 1983 arises only upon a showing of personal participation by the defendant."). A person deprives another of a constitutional right, "within the meaning of § 1983 'if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which

Executive S. Roberts, Chief Executive Officer M. Glynn, and Chief Physician and Surgeon R. Walker, Plaintiff alleges they are responsible for failing to "oversee" and/or supervise his attending RJD physicians and nurses, and for "reviewing" his administrative medical appeal, CDC 602 Log. No. RJD HC 14052082. (ECF No. 1 at 11-14; ECF No. 1-1 at 1-11.)

### 1.   RJD Treating Physicians and Nurses

As to Plaintiff's Eighth Amendment claims as to Drs. Robinson, Silva, and Cook, the Court finds he has failed to allege facts sufficient to show that any of them acted with deliberate indifference to his left thigh abscess in December 2013. *See Lopez*, 203 F.3d at 1126-27; *Peralta*, 744 F.3d at 1081-82.

While Plaintiff claims Robinson, Silva, and Cook "failed to adequately treat" his infection at the time (ECF No. 1 at 24, 37-39), he also admits they examined him, diagnosed him with cellulitis, performed an I&D, prescribed oral antibiotics and pain relievers, and ordered blood tests. (ECF No. 1 at 24, 38-39; ECF No. 1-1 at 16-60.) None of these facts "allow the court to draw the reasonable inference" that Robinson, Silva, or Cook chose a course of treatment that was "medically unacceptable under the circumstances" and in "conscious disregard of an excessive risk" to Plaintiff's health. *Iqbal*, 556 U.S. at 676; *Snow*, 681 F.3d at 988; *Farmer*, 511 U.S. at 837. Indeed, Plaintiff's left leg abscess was "resolved" by February 10, 2014. (ECF No. 1-1 at 54-55.)

As to Plaintiff's claims that Drs. Casian, Chau, Ghayori, Wiley, and Zhang, and RNs Paule, Kaestner, Benitez, Garcia, and Steward "failed to take reasonable action to summon … medical care" (ECF No. 1 at 25), for his right leg and knee infection both before and after his May 7, 2014 admission to AMC, the Court also finds he has failed to allege facts sufficient to show the deliberate indifference required to support an Eighth Amendment claim. *See Lopez*, 203 F.3d at 1126-27; *Peralta*, 744 F.3d at 1081-82.

---

complaint is made.'" *Preschooler II v. Clark Cnty. Sch. Bd. of Trs.,* 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)).

Plaintiff claims to have first requested medical attention for his right knee on March 24, 2014, but admits he was examined by an unidentified nurse who consulted with the "PCP on site" who prescribed Bactrim, and directed him to follow up in 5 days. (ECF No. 1 at 26; ECF No. 1-1 at 63-64). On April 1, 2014, Plaintiff was examined by RN Kaestner for a wound check. (ECF No. 1-1 at 65.) Plaintiff does not again complain about his right leg and knee until a month later, when on May 2, 2014, he filed an emergency request due to pain and swelling in his right knee, and was examined by RN Benitez (ECF No. 1-1 at 66, 76-77). Defendant Wiley examined him, and Dr. Karan ordered an x-ray, which showed swelling, but no fracture, and attempted to tap fluid from his sub-patellar space for testing. (*Id.* at 68, 70-71.) Plaintiff was diagnosed with prepatellar cellulits and bursitis, placed on oral antibiotics, anti-inflammatories and pain killers. (ECF No. 1 at 41; ECF No. 1-1 at 67, 68, 73, 79.) Two days later, Defendants Casian and Garcia noted his swelling had increased, and referred him to AMC for outpatient care. (ECF No. 1 at 29, 42; ECF No. 1-1 at 80-84, 96.) Following his return to RJD on May 7, 2014, Plaintiff admits being placed on oral antibiotics, anti-inflammatories, and pain medication. (ECF No. 1-1 at 107-108, 112-13), to have received a subsequent x-ray, and to have been examined no fewer than five times by Defendants Chau, Stewart, Ghayouri, Paule, and Zhang on May 7, 9, 16, 2014, July 17, 2014, and September 15, 2014. (ECF No. 1 at 29-31; ECF No. 1-1 at 108, 112-13; ECF No. 1-2 at 1-4, 6, 7-15.) Based on these facts, the Court finds Plaintiff has failed to plead facts that allow it to draw a reasonable inference that Drs. Casian, Chau, Ghayori, Wiley, and Zhang, and RNs Paule, Kaestner, Benitez, Garcia, and Steward may be held liable for violating Plaintiff's Eighth Amendment rights. *See Iqbal*, 556 U.S. at 678.

Plaintiff's additional allegations that Drs. Zhang, Newton, Suleiman, Wiley and RNs Wenzel, Paule, Janasco, Wallace, and Calderon failed to "pay attention" to his medical needs (ECF No. 1 at 31), "intentionally and unjustifiably failed to summon medical care," (id. at 43, 47), and either failed to "prevent" his surgery and/or "intentionally delayed"

///

treatment (*id.* at 32-34), also fails to state a plausible claim for relief. *Iqbal*, 556 U.S. at 679.

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). Here, nothing in either Plaintiff's Complaint or the exhibits he has attached supports his claims of deliberate indifference as to these Defendants' treatment of his right knee infection either prior to or following his September 28, 2014 re-admission to AMC. Specifically, Plaintiff admits to have been examined by Dr. Zhang on September 15, 2014 complaining of pain, and to have undergone an x-ray three days later, which showed swelling, but no fracture, and to have been prescribed etodolac. (ECF No. 1 at 30-31; ECF No. 1-2 at 7-11, 14.) Ten days later, Plaintiff alleges to have developed a fever, was evaluated by RN Wenzel and Dr. Suleiman, and on that same day authorized for immediate transfer and admitted to AMC. (ECF No. 1 at 25-26, 32, 44-45; ECF No. 1-2 at 16, 21-23.) Upon his discharge from AMC on October 2, 2014, Plaintiff admits Drs. Zhang, Newton and Garikaparthi all prescribed a continued course of oral antibiotics and pain medication, as recommended by his AMC physicians upon discharge. (ECF No. 1 at 45; ECF No. 1-2 at 48-49, 53, 63-68.) RNs Paule, Janasco, and Wallace treated his surgical wound and changed his dressings on at least three separate occasions between October 2-5, 2014 (ECF No. 1-2 at 54-55, 59, 61, 62), and when Dr. Zhang examined him again on October 17, 2014, and again on November 4, 2014, Plaintiff's infection had resolved, he had completed his course of antibiotics, was able to move his right knee freely, and continued to use pain medication. (ECF No. 1-2 at 72, 74, 77, 82). Plaintiff complained again of knee pain in January 2015, but was evaluated by RN Calderon, prescribed Naproxen and scheduled for a follow-up appointment with his PCP. (ECF No. 1 at 47; ECF No. 1-2 at 87-90). Plaintiff next alleges to have been evaluated by Dr. Zhang on January 20, 2015, who prescribed Voltaren gel, and approved him for a bottom bunk, (ECF No. 1 at 47; ECF No. 1-2 at 92-96), and to have only again reported knee pain on May 20, 2015, when he was examined by D. Wiley, prescribed more pain medication, and given a

neoprene knee brace after he exacerbated his knee injury playing soccer. (ECF No. 1 at 48; ECF No. 1-2 at 99-100.)

Based on the facts as Plaintiff himself has alleged, the Court finds he has failed to "nudge[] [his] claims" of deliberate indifference as to *any* named Defendant "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570). Therefore, his remaining Eighth Amendment claims must be dismissed sua sponte pursuant to 28 U.S.C. § 1915(e)(2). *Lopez*, 203 F.3d at 1126-27; *Watison*, 668 F.3d at 1112.

## 2.    RJD Supervisory Defendants

As to Defendants Walker, Roberts, and Glynn, none of whom are alleged to have treated Plaintiff personally, but instead are alleged to have negligently supervised or instructed Plaintiff's treating doctors and nurses "on how to treat or identify MRSA," (ECF No. 1 at 2, 27), and to have reviewed his CDCR 602 Inmate/Parolee Health Care Appeal, Log No. 14052082, (id. at 10-14, 40-41; ECF No. 1-1 at 2-11), the Court also finds Plaintiff has failed to state a claim upon which relief can be granted. *Lopez,* 203 F.3d at 1126-27.

To state a claim, Plaintiff must demonstrate that each defendant personally participated in the deprivation of his constitutional rights. *Iqbal*, 556 U.S. at 673; *Colwell v. Bannister,* 763 F.3d 1060, 1070 (9th Cir. 2014). Liability may not be imposed on supervisory personnel for the acts or omissions of their subordinates under the theory of respondeat superior. *Iqbal*, 556 U.S. at 672-673; *Jones v. Williams,* 297 F.3d 930, 934 (9th Cir. 2002). Instead, supervisors may be held liable only if they "participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *accord Starr v. Baca*, 625 F.3d 1202, 1205-06 (9th Cir. 2011).

Here, Plaintiff alleges no facts to show how or to what extent Defendants Walker, Walker, or Glynn personally violated his Eighth Amendment rights, directed the other Defendants to violate his rights, or knew of their subordinates' violations and failed to prevent them. *Id.* And while Defendants Walker, Roberts, and Glynn are alleged to have reviewed Plaintiff's CDCR 602 Inmate/Parolee Health Care Appeal, (ECF No. 1 at 12-4)

this, by itself, is insufficient to support any independent constitutional violation. *See Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) (finding it well-established that "inmates lack a separate constitutional entitlement to a specific prison grievance procedure.") (citing *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988)); *Randall v. Arnold*, No. 2:15-CV-1711-EFB P, 2016 WL 4399391, at *4 (E.D. Cal. Aug. 18, 2016) (finding that a prisoner "may not impose liability on defendants simply because they played a role in processing [his] inmate appeals."(citing *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993)); *Archini v. Sanders*, No. 2:14-CV-1392-CMK-P, 2015 WL 5698384, at *3 (E.D. Cal. Sept. 28, 2015) (sua sponte dismissing prisoner's claims against officials who denied his 602 inmate grievance for failing to state a claim pursuant to 28 U.S.C. § 1915A); *Smith v. Calderon*, No. C 99-2036 MJJ PR, 1999 WL 1051947 at *3 (N.D. Cal. 1999) (finding "the defendants' alleged failure to properly process and decide [plaintiff's] administrative grievance and appeals did not violate any constitutional right").

## VII.   Supplemental Jurisdiction

All that remains is Plaintiff's "Second Cause of Action" alleging pendent state law violations against all Defendants for "medical negligence and malpractice" in violation of CAL. GOVT. CODE § 845.6 and 815.2 (ECF No. 1 at 37).

Federal courts should refrain from exercising their pendent jurisdiction over state law claims when the federal claims are dismissed before trial. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Because the Court has found that Plaintiff has failed to state an Eighth Amendment claim as to *any* named Defendant, it declines to exercise supplemental jurisdiction over Plaintiff's state law negligence and malpractice claims pursuant to 28 U.S.C. § 1367(c)(3). *See Carlsbad Tech., Inc. v. HIF Bio, Inc.,* 556 U.S. 635, 639 (2009) (district court retains discretion over whether to exercise supplemental jurisdiction over state law claims after all federal claims are dismissed); *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction."); *Lacey v. Maricopa Cty.*, 693 F.3d 896, 940 (9th Cir. 2012) (accord).

### Conclusion

For all the reasons discussed, the Court:

1)   **GRANTS** Defendant Hood and Defendant Butera's Motions to Dismiss pursuant to FED. R. CIV. P. 12(b)(6) (ECF Nos. 8, 10);

2)   **DISMISSES** Plaintiff's Eighth Amendment claims as to all remaining Defendants sua sponte for failing to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(b)(ii);

3)   **DECLINES** to exercise supplemental jurisdiction over Plaintiff's supplemental state law claims pursuant to 28 U.S.C. § 1367(c)(3); and

4)   **GRANTS** Plaintiff forty-five (45) days leave in which to file an Amended Complaint that addresses the pleading deficiencies identified in this Order. Plaintiff is cautioned, however, that should he choose to file an Amended Complaint, it must be complete by itself, comply with Federal Rule of Civil Procedure 8(a), and that any claim not re-alleged will be considered waived. *See* S.D. CAL. CIVLR 15.1; *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1546 (9th Cir. 1989) ("[A]n amended pleading supersedes the original."); *Lacey,* 693 F.3d at 928 (noting that claims dismissed with leave to amend which are not re-alleged in an amended pleading may be "considered waived if not repled."). If Plaintiff fails to follow these instructions and/or files an Amended Complaint that still fails to state a claim, his case will be dismissed without further leave to amend. *See Lira v. Herrera*, 427 F.3d 1164, 1169 (9th Cir. 2005) ("If a plaintiff does not take advantage of the opportunity to fix his complaint, a district court may convert the dismissal of the complaint into dismissal of the entire action.").

**IT IS SO ORDERED**.

Dated:  September 15, 2016

Hon. Gonzalo P. Curiel
United States District Judge